No. 63,729

JAMES E. GOOCH, SR., *et al.*, *Appellants*, v. BETHEL A.M.E. CHURCH, *et al.*, *Appellees*.

(792 P.2d 993)

Opinion filed May 25, 1990.

*Thomas L. Thurston*, of Perry & Hamill, of Overland Park, argued the cause, and *Carston C. Johannsen*, of the same firm, was with him on the briefs for appellant.

*Robert D. Beall*, of Davis, Beall, McGuire & Thompson, of Leavenworth, argued the cause and was on the brief for appellee City of Leavenworth.

*David W. Hauber*, of Boddington & Brown, Chtd., of Kansas City, argued the cause, and *Kenneth E. Holm*, of the same firm, was with him on the brief for appellees Julius David Kaaz and Julius Kaaz Construction Company, Inc.

*Glenn McCann*, of Knipmeyer, McCann, Smith, Manz & Gotfredson, of Kansas City, Missouri, argued the cause and was on the brief for appellees GAB Business Services, Inc., and Gerald L. Albright.

*Richard D. Anderson*, of Entz, Anderson & Chanay, of Topeka, was on the brief for *amicus curiae* The Associated General Contractors of Kansas, Inc.

The opinion of the court was delivered by

HOLMES, J.: The plaintiffs appeal from an order of the district court granting summary judgment to certain defendants in an action for the personal injury and wrongful death of Ira and

Augustus Pettis. Mr. and Mrs. Pettis were killed when a church collapsed on their residence. Several of the defendants settled with the plaintiffs and the non-settling defendants were subsequently granted summary judgment. We affirm.

As this is an appeal from the granting of summary judgment, the facts will be stated in some detail.

On the evening of August 8, 1985, the Bethel A.M.E. Church (Bethel Church) at 411 Kiowa, Leavenworth, Kansas, partially collapsed on the residence of Ira and Augustus Pettis, killing both of them. The Pettis residence was located to the west of the church and the church parsonage was located to the east of the church. Apparently there was not much space between the two residences and the church building.

The plaintiffs include the heirs-at-law of Mr. and Mrs. Pettis, and James E. Gooch, as administrator of the estates of Ira Pettis and Augustus Pettis. The plaintiffs' petition asserted claims for trespass and negligent failure to warn against Church Mutual Insurance Company (CMIC), Dressler Engineers (Dressler), GAB Business Services, Inc. (GAB), and Gerald L. Albright. Plaintiffs also asserted a claim for trespass against the Bethel Church and a claim for negligent failure to warn against the City of Leavenworth (City). In their first amended petition, the plaintiffs added a claim of negligent failure to warn against Bethel Church and named African Methodist Episcopal Church, Inc.; M.D. Cooper, d/b/a M.D. Cooper & Associates Consulting Engineers (Cooper); Julius David Kaaz (Kaaz); and Julius Kaaz Construction Co., Inc. (Kaaz, Inc.), as additional defendants. Plaintiffs asserted claims of trespass and negligent failure to warn against each of the additional defendants. Apparently, the plaintiffs brought a separate action against W.F. Mothersbaugh, d/b/a W.F. Mothersbaugh & Son, Inc. (Mothersbaugh), and the two cases were consolidated in the district court.

The Bethel Church, CMIC, African Methodist Episcopal Church, Inc., Cooper, Dressler, and Mothersbaugh settled with the plaintiffs, and the actions against them were dismissed. Thus, plaintiffs' appeal concerns only defendants Kaaz, Kaaz, Inc., GAB and its employee Gerald L. Albright, and the City.

The voluminous record in this case, consisting of thirty-three volumes, includes one thousand four hundred forty-seven pages

of pleadings, four partial transcripts of various court hearings, and twenty-six discovery depositions. The trial court, in ruling upon the motions for summary judgment filed by Kaaz, Kaaz, Inc., GAB, Albright, and the City, made one hundred eighty-five findings of fact. With this record before us, we turn to the events leading to the collapse of the church building and the filing of this action.

In June of 1985, Rev. Warren, pastor and president of the board of trustees of the Bethel Church, noticed that the east wall of the church was pulling away from the ceiling and informed Tom Bragg, Staff Johnson, and Landon Jackson, the other members of the church board of trustees. Bragg suggested contacting Kaaz, president of Kaaz, Inc., which had done some repair work at the church in prior years. Kaaz inspected the church and found problems with the ceiling truss system and a separation of the east wall from the ceiling. Kaaz then informed Bragg and Johnson that "they would have to get the services of a structural engineer and analyze the truss system to come up with a design for possible repair or replacement" and indicated the church building needed prompt attention.

On June 11, 1985, the Bethel Church filed a claim with CMIC, its property damage insurance carrier, claiming the church had been damaged by wind. On the same date, CMIC contacted the Overland Park offices of GAB "and requested GAB to investigate and adjust the property damage claim made by the Bethel Church on behalf of and for Church Mutual Insurance Company." GAB's business is investigating and adjusting insurance claims for insurance companies. Defendant Gerald L. Albright, one of GAB's branch managers, made arrangements with Rev. Warren to inspect the church property. On June 21, 1985, Albright met with Rev. Warren. Not knowing what caused the damage, Albright called Patricia Heller, a claims examiner with CMIC, and recommended that CMIC hire an engineer to look at the church. After Heller authorized Albright to obtain an engineer, Albright contacted Dressler Engineers, which agreed to inspect the church and prepare a report for CMIC.

Ron Haskey, an architectural engineer with Dressler, and Donald Dressler inspected the church on June 24, 1985. Kaaz was present to point out to Haskey what he had observed on his

previous inspection of the church. Haskey determined the church was "unsafe for human occupancy" and indicated the City should be notified.

The City was notified and David Pennington, the Leavenworth Public Works Director and City Engineer, inspected the property on June 24 or 25. He informed one of the church members that he would have to post the church as unfit for habitation because of his concern that plaster from the ceiling would fall on someone. He also informed church officials that they needed to hire an engineer to determine the necessary repairs which would have to be completed before they could resume use and occupancy of the building. The property was posted as unfit for habitation and the front and east sides of the church were barricaded and roped off. The church officials were ordered "to repair or remove the structure within 30 days."

Dressler furnished its written report, dated June 28, 1985, to GAB for CMIC. The written report stated the church was "hazardous to human occupancy" and recommended "the immediate shoring of the east wall and deficient ceiling structure." Further, it stated: "All work should be conducted under the supervision of a registered professional engineer." Dressler's report and the deposition of Donald Dressler further indicate that there was an immediate danger that the church ceiling would collapse into the sanctuary. Albright, who received the report on July 1, 1985, prepared a report for CMIC which included a copy of the Dressler report. Albright's report stated that the building was dangerous and indicated that he had recommended to Rev. Warren that the area between the parsonage and the church building be roped off. By the time Albright prepared his report, the City had already barricaded and roped off the church.

On or about July 1, 1985, church trustee Tom Bragg contacted M.D. Cooper, a friend, and asked Cooper to look at the building and see what could be done. Cooper is a licensed civil engineer and he forthwith viewed the property. On either July 2 or July 3, Cooper informed Bragg that the east wall, being cracked, posed a hazard to the parsonage and that "repairs had to be implemented immediately." On July 3, 1985, Cooper prepared a proposal for designing plans for the shoring and repair of the church, including the provision of inspection services during repair and

assistance in evaluating the bids the Bethel Church received. In his proposal, he stated that he would have "complete contract documents ready to bid six weeks after acceptance of this proposal (sooner if possible)." Rev. Warren and Bragg accepted the proposal on behalf of the Bethel Church.

On July 9, 1985, Cooper again inspected the church and drew plans and tentative bid specifications for the church's repair. On July 11, 1985, he submitted his plans to the Bethel Church which had set an August 28, 1985, deadline for bids. Cooper noted, "Failure is progressing. Time is of the essence." On July 25, 1985, Kaaz, who was interested in bidding on the repairs, met Cooper at the church property. They discovered that more plaster from the ceiling had fallen into the sanctuary, and Kaaz informed church trustees that he was no longer interested in bidding on the repairs because he did not feel his men would be safe working there.

On August 1, 1985, Bragg called Cooper and stated he wanted demolition to be an option in the plans. On August 2, 1985, William Mothersbaugh, a contractor who church officials had contacted on July 29 or July 30, inspected the church. On August 5, 1985, Rev. William F. Dancy, a prior pastor of the church, asked William H. Johnson, an architect, to look at the church. Johnson noticed the bow in the east wall of the church which Dancy stated had been there since 1964. Dancy testified that at least one roof beam had fallen through the ceiling. Johnson testified that at least one of the roof trusses was one foot or more below ceiling level. Johnson also testified that "to appreciate the Church truss system, you would have to be a structural engineer, not just an engineer."

On August 6, 1985, Mothersbaugh submitted a bid for the repair work. Church officials had not responded to Mothersbaugh's bid when the church building collapsed on August 8, 1985, killing Mr. and Mrs. Pettis.

As indicated earlier, the Bethel Church, CMIC, Dressler, Cooper, African Methodist Episcopal Church, Inc., and Mothersbaugh settled with the plaintiffs for a total of $155,000. GAB and its employee Albright, Kaaz, Inc., and its president and employee Kaaz, and the City, the remaining defendants, were granted summary judgment in detailed findings of fact and con-

clusions of law announced by the court on December 10, 1988. The plaintiffs, in appealing, have abandoned any claims based upon their theory of trespass and the controlling issue before this court is whether the defendants, or any of them, had a duty to warn Mr. and Mrs. Pettis.

Before turning to the issues on appeal, we will once again set forth certain basic rules relating to the granting of summary judgment in a negligence action.

"The burden on the party seeking summary judgment is a strict one. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. On appeal we apply the same rule, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citation omitted.] The party opposing summary judgment, however, has the affirmative duty to come forward with facts to support its claim, although it is not required to prove its case. [Citations omitted.] If factual issues do exist, they must be material to the case to preclude summary judgment." *Bacon v. Mercy Hosp. of Ft. Scott*, 243 Kan. 303, 306-07, 756 P.2d 416 (1988).

"Summary judgment is proper where the only questions presented are questions of law." *Barber v. Williams*, 244 Kan. 318, Syl. ¶ 1, 767 P.2d 1284 (1988).

"For negligence to exist there must be a duty and a breach thereof before the conduct becomes actionable. If no duty exists there can be no negligence." *Hanna v. Huer, Johns, Neel, Rivers & Webb*, 233 Kan. 206, Syl. ¶ 5, 622 P.2d 243 (1983).

"Whether a duty exists is a question of law. [Citations omitted.] Whether the duty has been breached is a question of fact." *Duflinger v. Artiles*, 234 Kan. 484, 488, 673 P.2d 86 (1983).

"In order to preclude summary judgment, the facts subject to dispute must be material to the conclusive issues in the case. An issue of fact is not genuine unless it has legal controlling force as to a controlling issue. A disputed question of fact which is immaterial to the issue does not preclude summary judgment. If the disputed fact could not affect the judgment, it does not present a genuine issue of material fact." *Miller v. Foulston, Siefkin, Powers & Eberhardt*, 246 Kan. 450, Syl. ¶ 2, 790 P.2d 404 (1990).

Plaintiffs claim two theories give rise to the defendants having a duty to warn: First, under Restatement (Second) of Torts § 324A (1964) (hereafter § 324A), defendants gratuitously undertook to render services of inspection for the Bethel Church which they should have recognized as necessary for the protection of third parties, the decedents; second, a duty existed because defendants

knew or should have known of the danger to the Pettises as a result of the church's condition.

Plaintiffs' principal argument is that defendants had a duty to warn Mr. and Mrs. Pettis based upon the application of the § 324A, which provides:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect [sic; perform] his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

The trial court found no duty under § 324A because the defendants did not agree to be, or by their actions voluntarily assume to be, responsible for the safety of the structure. On appeal, plaintiffs claim they are not asserting the defendants undertook a duty to repair the structure, or be responsible for its safety; rather, they claim defendants gratuitously undertook a duty of inspection which the Bethel Church owed to plaintiffs' decedents for the purpose of determining whether the church was safe, and part of that duty would be to warn persons who would be in danger between the time of discovery and repair. Defendants contend they did not undertake to render services to the Bethel Church because their inspections were for their own benefit and because they had no agreement or intent to be responsible for the safety and structure of the church.

This court first recognized and adopted the principles upon which § 324A is based in *Jenree v. Street Railway Co.*, 86 Kan. 479, 121 Pac. 510 (1912). Section 324A has been considered by this court in several recent cases. The threshold requirement for the application of § 324A is that the defendant must undertake, gratuitously or for consideration, to render services to another. In each of the Kansas cases imposing liability under § 324A, it was clear that this requirement was met. In *Schmeck v. City of Shawnee*, 232 Kan. 11, 651 P.2d 585 (1982), KCPL agreed to and was hired to render traffic engineering services to the City.

In *Ingram v. Howard-Needles-Tammen & Bergendoff*, 234 Kan. 289, 672 P.2d 1083 (1983), the Kansas Turnpike Authority hired Howard-Needles as its consulting engineers to make safety inspections of the turnpike and thus render services to the KTA. In *Cansler v. State*, 234 Kan. 554, 675 P.2d 57 (1984), there was evidence the county agreed with Kansas State Penitentiary officials and other law enforcement agencies to notify these agencies of escapes from the penitentiary. In *Fudge v. City of Kansas City*, 239 Kan. 369, 720 P.2d 1093 (1986), the police were obligated by a general police department order to take certain incapacitated persons into custody. Further, in the cases not finding a duty, it was clear there was no undertaking. In *Hanna v. Heur, Johns, Neel, Rivers & Webb*, 233 Kan. 206, the court found the defendant architects did not agree to be responsible for safety practices on the jobsite and took no actions indicating they assumed any such responsibility. In *Meyers v. Grubaugh*, 242 Kan. 716, 750 P.2d 1031 (1988), the State simply allowed the intoxicated employee to leave work. Thus, in all cases where it was found that the parties undertook to render services to another, they agreed to or were obligated to perform services for another that were accepted and thus the initial requirement of § 324A was met; and, in all cases where liability was not imposed, the defendants had no agreement and took no affirmative action that could be construed as an intentional undertaking to render services to another.

Plaintiffs basically contend that the inspections of the church property by Albright, on behalf of his employer GAB, by Kaaz, on behalf of his construction company, and by David Pennington, as city engineer for the City, constituted an undertaking by these defendants to render services to the Bethel Church. Defendants, on the other hand, contend that an undertaking requires considerably more than the limited inspections shown by this record.

Many of the cases which have found an undertaking to perform services under § 324A involve negligent inspections of an insured's property by property or liability insurance carriers. While such cases might be persuasive if CMIC were a party to this appeal, they do not directly address the factual situation now before the court.

Plaintiffs cite several cases, but only two can be construed as favorable to them in exploring when an undertaking occurs. In *American Mut. Liability Ins. Co. v. St. Paul F. & M. Ins. Co.*, 48 Wis. 2d 305, 179 N.W.2d 864 (1970), an employee of Menominee Enterprises was injured when a cast-iron fitting on a boiler ruptured. After paying workers compensation to the injured employee, the workers compensation carrier sued St. Paul Fire & Marine Insurance Company, the boiler insurer, claiming it negligently performed inspections on the boiler. While the evidence was clear that St. Paul was not contractually obligated to inspect the boilers, it also showed St. Paul conducted such inspections and made a report including its recommendations to the employer. Further, the Supervisor of the Boiler Section of the Industrial Safety and Building Division of the Department of Industry, Labor and Human Relations, stated in his affidavit that the Department had issued certificates to two of St. Paul's employees authorizing them to inspect boilers. The affidavit further showed that, when reports were submitted to the Wisconsin Industrial Commission based upon inspections made by certified insurance company inspectors, the Commission did not usually conduct an inspection and that, because of St. Paul's inspections, the Commission did not inspect the Menominee boilers for a period of nearly two years. The district court granted summary judgment to St. Paul, finding no tort duty because St. Paul conducted the inspections for its own interests, no service contract existed, and no evidence showed inspection reports were submitted to the Commission.

In reversing the trial court's granting of summary judgment, the court first emphasized that St. Paul's affidavit only addressed whether it contractually obligated itself to make boiler inspections, ignoring the negligence claim made under § 324A. The court, in considering § 324A, stated: "Under this view it is immaterial in a negligence action whether or not the defendant contractually obligated itself to inspect the boilers. It is enough that it undertook to inspect the boilers and that it did so negligently." 48 Wis. 2d at 313. The court went on to state:

"One of the leading cases in the country is *Hartford Steam Boiler Inspection and Ins. Co. v. Pabst Brewing Co.* (7th Cir. 1912), 201 F. 617. This case arose in the State of Wisconsin in a dispute between the Pabst

Brewing Company and its boiler insurer. In that case the insurer's inspection arose *ab extra* the contract. The court stated:

'Inspection of the boilers necessarily requires care and skill in its performance for safety in their use, *and, when thus undertaken by the Insurance Company to serve as a benefit to the assured, the duty arises,* with or without contract obligation to inspect, to exercise reasonable care and skill in each inspection so made, although no such rule of duty obtains in favor of the assured where the inspections are attributable alone to the policy provision for the sole benefit of the insurer, which would leave no ground for a finding of fact that they were understood between the parties to be made and accepted as inspection service for direct benefit to the Brewing Company. *But, if so made and accepted as beneficial service,* we understand the above-mentioned rule to be applicable as well with or without contract obligation for the service; that it is such making of the inspections, and no obligation on the part of the Insurance Company to make them, upon which the duty of care arises. (P. 629)'

"We believe the above reasoning is applicable to the instant case. Menominee Enterprises, the employer, had a clear obligation to inspect the boilers and to make sure that they were safe. *While it is no doubt true that the inspection was made in part for the benefit of the insurance company, there is evidence which if believed on trial would lead to the conclusion that the inspection service was accepted for the direct benefit of Menominee Enterprises."* 48 Wis. 2d at 315-16. (Emphasis added.)

By its reliance upon *Pabst Brewing Co.,* it appears that the court in *American Mut. Liability Ins. Co.* based its holding, at least in part, on a finding that the boiler inspection services were done for the benefit of Menominee Enterprises, as well as for the insurance company, and that the services were accepted by the insured. There were also procedural problems which precluded the granting of summary judgment.

In *Sims v. American Cas. Co.,* 131 Ga. App. 461, 206 S.E.2d 121 (1974), another case relied upon by plaintiffs, an employee of Bio-Lab, Inc., died from burn injuries sustained when a volatile alcohol-based product ignited. The complaint alleged the defendants, several insurance companies, had negligently inspected the premises where the deceased was working when injured. Specifically, the complaint alleged defendants made these inspections pursuant to insurance policies and, independently of the policies, the inspections were made "not only to rate the risk but to help Bio-Lab reduce its accidents and losses and to protect the lives, health and safety of its employees." 131 Ga. App. at

467. The trial court granted the defendants' motions to dismiss for failure to state a claim and not on the basis of summary judgment based upon a factual record.

The court considered the issue before it as whether Georgia recognizes a common-law cause of action for negligent performance of safety inspections. After reviewing several cases, the court found a cause of action, concluding: "A study of the foregoing authorities, and of Restatement, Second, Torts § 324A, leads to the conclusion that defendants' duty may arise from contract or from undertaking actual inspections without contract." 131 Ga. App. at 473. All that *Sims* actually decided was that the allegations of the amended complaint which, *inter alia*, alleged the inspections were conducted "to protect the lives, health and safety of employees" were sufficient to state a cause of action on behalf of an employee who was injured following an alleged negligent inspection by the defendant insurance company.

While the authorities relied upon by the plaintiffs do make it clear that there may be liability under both the common law and § 324A for a gratuitous rendering of services, none goes so far as to hold that there is liability absent an undertaking to perform services for another. In all the cases there was some duty by another to a third person assumed by the party sought to be held liable which, when the duty was breached, led to the injury of the third person.

Defendants, who assert that they did not undertake to render services to the Bethel Church, rely on numerous cases to support their position. Among the cases is *Smith v. Allendale Mutual Ins. Co.*, 410 Mich. 685, 303 N.W.2d 702 (1981), which is instructive because of the thoroughness of the court's analysis of the threshold requirement, under § 324A, that the defendant must have undertaken to render services to another.

In *Smith*, the Michigan Supreme Court considered, in two consolidated cases, whether an insured's fire insurance carrier, who inspects the insured's plant for fire hazards and makes safety recommendations based upon these inspections, can be liable to the insured's employees for negligent inspection in failing to detect fire hazards. In finding no duty under § 324A, the court first recognized that the Restatement does not have the force of a statute, which is a legislative determination controlling future

acts, but is an attempt to state existing common-law principles which have evolved over the years from prior cases. In determining there was no liability upon the defendants, the court stated: "[W]e conclude that the insurers in these cases are not liable to plaintiffs under the common-law rule restated in § 324A because on these records the relationships did not give rise to an undertaking creating a duty to inspect with due care." 410 Mich. at 713. In reaching its conclusion, the court stated:

"Section 324A provides that an actor who *undertakes*, gratuitously or for consideration, *to render services to another*' (emphasis supplied) may in certain circumstances be liable to foreseeable third persons for negligence. Plaintiffs maintain that by inspecting the Farm Bureau feed mill and the Great Lakes Steel plant for fire hazards, the insurers in these cases embarked upon gratuitous undertakings within the ambit of § 324A.

"In our view, plaintiffs misconceive the sweep of the section's principles. The illustrations given in the official comments to § 324A and the cases cited by way of example in the Reporter's Notes involve either a contractual undertaking by a defendant to render particular services, an undertaking by an agent or employee to render services to his employer as part of the agency or employment, or an undertaking whose unambiguous object is to benefit another and which would not have been performed primarily for the actor's purposes.

"One can agree with the general proposition that any person, including an insurer, who assumes to act must act with reasonable care without concluding that the insurers in these cases are subject to liability under the rule of § 324A. It is not enough that the insurer acted. It must have undertaken to render services to another. Its acts do not constitute such an undertaking unless it agreed or intended to benefit the insured or its employees by the inspections.

"Ordinarily the question whether an actor has undertaken to render services to another is not in dispute. In the instant case, the central question, as we see it, is whether such an undertaking to serve another can be *established from conduct which is consistent with an intention primarily to serve the purposes of the actor.*

"The law does not impose a duty upon an insurer who inspects in the absence of conduct evidencing an agreement or intent to benefit others by the inspection; only in such a case has the insurer acknowledged the propriety of judging the competence of its inspection by a standard which measures its potential effect on others. This concept of acknowledged obligation to another is comprehended by § 324A's threshold description of '[o]ne who undertakes * * * to render services to another'; the rule stated in § 324A by its terms does not apply to an actor following a self-serving course of conduct.

"While an undertaking which may give rise to liability under the rule of § 324A may be gratuitous as well as contractual, the evidence must show that the actor assumed an obligation or intended to render services for the benefit of another. Evidence demonstrating merely that a benefit was conferred upon another is not sufficient to establish an undertaking which betokens duty. Persons pursuing their own interests often benefit others in the process. Accordingly, where a plaintiff seeks to prove an undertaking by conduct which benefits another and that conduct is consistent with a primary purpose on the part of the actor to benefit himself, the plaintiff must offer additional evidence to create a jury question whether there was an undertaking to render services and hence a duty to one who might foreseeably be injured by the actor's failure to perform the undertaking with reasonable care.

"An inspection for fire hazards does not in itself represent that the insurer has done more than seek to reduce claims or determine whether it is willing to underwrite or remain on the risk. Identification of fire hazards and the making of recommendations to the insured do not in themselves suggest an objective other than to reduce the insurer's losses on the policy or to justify a decision by the insurer to raise or lower rates or to decline or remain on the risk; such conduct does not imply an undertaking to warn the insured of reasonably identifiable fire hazards.

"This is not to say that a fire insurer may not undertake to render fire inspection services to its insured and thereby incur a duty, breach of which will subject it to liability. If the insurer promises to provide complete fire inspection services to alert the insured to fire hazards on the premises, its failure to exercise reasonable care in performing that undertaking will subject it to liability under the rule of § 324A.

"Absent such a specific undertaking, there must be evidence other than the fact of inspection and consequent loss prevention to indicate that the insurer undertook to render fire inspection services for the insured's benefit before a negligent inspection claim can be submitted to the jury. For example, if the insurer's advertising or communications with its policyholders represent that its inspection services will relieve the insured of the burden of monitoring its own facilities, it has undertaken to render inspection services for the benefit of the insured and is subject to liability if it fails to exercise reasonable care in performing that undertaking. It would be for a jury to decide whether the insurer failed to inspect with reasonable care and whether that failure caused the plaintiff's injury.

"In sum, a fire insurer who inspects its insured's premises for fire hazards does not, merely by making the inspections, however thorough and frequent they may be, undertake to render services to the insured." 410 Mich. at 715-19.

The United States District Court for the District of Kansas adopted the reasoning of *Smith v. Allendale Mutual Ins. Co.*, 410 Mich. 685, in *Leroy v. Hartford Steam Boiler Inspec. and Ins.*

*Co.*, 695 F. Supp. 1120 (D. Kan. 1988), and granted summary judgment to INA/Aetna, the employer's workers compensation insurance carrier which made plant inspections pursuant to a property damage/liability coverage policy. In doing so, the court found no evidence INA/Aetna conducted the inspections for any purpose other than loss reduction and underwriting.

We find the reasoning and analysis of the Michigan court to be persuasive. For a defendant to meet the threshold requirements of § 324A, the defendant must not only take affirmative action to render services to another, but the person to whom the services are directed must accept such services in lieu of, or in addition to, such person's obligation to perform the services. Did the defendants in the present case undertake to render services to the Bethel Church? We cannot find that they did. It is interesting that the plaintiffs have not asserted, and apparently do not contend, that the defendants were negligent in performing the various inspections of the church property. However, in considering the record in the light most favorable to plaintiffs, we assume that plaintiffs are asserting a negligent failure to properly inspect the building and further assume that the inspections were negligently performed. However, as numerous cases aptly point out, a negligent inspection does not in and of itself give rise to liability to third persons or create any duty on these defendants to provide a warning to the decedents.

In the present case, GAB and its employee Albright were hired by CMIC, not the Bethel Church, to adjust an insurance claim asserted by the Bethel Church. At no time did Albright undertake to render any services to the Bethel Church, and his actions in inspecting the church structure were solely for the benefit of his employer and CMIC. The trial court, in extensive findings of fact pertaining to GAB and Albright, found, *inter alia*:

"GAB was employed by and on behalf of Church Mutual Insurance Company for the sole purpose of investigating and adjusting the alleged property damage claim made by Bethel A.M.E. Church, and neither GAB nor Albright performed any other services with regard to the Bethel A.M.E. Church structure."

"Albright retained Dressler Engineers on behalf of Church Mutual for the sole purpose of determining whether the damage to the Church structure was covered under the provisions of the property damage insurance . . . [and] Church Mutual paid Dressler for their services."

"Albright knew that there was a danger of the ceiling of the Bethel A.M.E. Church falling and knew there was damage to the east wall of the Church, but from the time of his initial contact with the Bethel A.M.E. Church structure until he found out the Church structure had collapsed he never had any understanding or knowledge and was never told the Church structure could collapse to the west onto the residence of the Pettises."

The court also found:

"Of those who inspected the church, the opinions were that the greatest danger was possible collapse of the ceiling and, thus, there was danger to occupants of the church. The west wall appeared straight, true and sound. The collective opinion was that there was no existing danger to the residents on the west."

Albright was not an engineer, and, when he first viewed the church building, he recognized that he could not make any determination as to the cause of the damage and could not determine whether CMIC had any liability to the Bethel Church. He recommended that CMIC employ an engineer and that was done. Dressler was contacted by GAB to inspect the church for CMIC and was not retained by the Bethel Church. The services rendered by Dressler, who has settled with the plaintiffs, were for CMIC. We find nothing in this record which would indicate that GAB and Albright undertook to render services to the Bethel Church.

The record concerning the involvement of Kaaz and Kaaz, Inc., is similar to that regarding GAB and Albright. Kaaz had previously done work for the Bethel Chuch and was contacted by one of the church trustees to look at the existing problem. Kaaz immediately recognized that an evaluation of the damage and the repairs needed were beyond his expertise, and he recommended that the Bethel Church obtain the services of an engineer. From that point on, the involvement of Kaaz was merely to point out to church officials, their engineer, and others what he had observed. From the outset Kaaz approached the problem as a possible repair job for his construction company, not as an undertaking on behalf of the Bethel Church. He ultimately determined that he was not even interested in bidding upon the church repairs due to the extensive damage which had occurred in the interim and the potential danger to his workers. However, nothing indicates any undertaking for the benefit of the Bethel

Church that could conceivably create a duty on Kaaz under § 24A to warn plaintiffs' decedents. Absent any duty to warn the Bethel Church, there could be no duty extending to Mr. and Mrs. Pettis. The fact that the Bethel Church may have had a duty to warn the Pettises does not create such a duty in these defendants absent an undertaking to render services to the Bethel Church and an acceptance of those services by the Bethel Church. This record does not support any finding that Kaaz undertook to render such services, and it is clear that any inspection by Kaaz was primarily for his own benefit and not for the benefit of the Bethel Church.

It should be noted that the Bethel Church at no time surrendered its obligations relating to the church property to any of these defendants. To the contrary, the church officials aggressively pursued their own course and direction to see that the damage was promptly evaluated and took affirmative steps to address the problems independent of any actions by the defendants.

We turn next to the alleged liability of the City based upon the actions of its city engineer, David Pennington When the City was alerted as to a potentially dangerous situation at the church, it moved promptly through David Pennington to make an evaluation of the property.

In *Siple v. City of Topeka*, 235 Kan. 167, 679 P.2d 190 (1984), this court held:

"Inspection laws are regulations designed to safeguard the public against fraud [and] injury and to promote the public health, safety and welfare. They provide for the examination or inspection of property by an authorized public official. The public official is to examine and determine whether the standards prescribed by the regulations are complied with." Syl. ¶ 2.

"Statutes, ordinances and codes requiring inspections are enacted by governmental entities to secure for the public at large the benefits of such enactments. The legislature determined inspection activities are to be encouraged rather than discouraged by the imposition of civil tort liability. Inspections under such statutes, ordinances and codes are not a private service to the owner or occupier of the property. Inspection laws do not create a duty to an individual. K.S.A. 1983 Supp. 75-6104(j) precludes an individual from recovering damages caused by a governmental employee acting within the scope of his employment in failing to make, or making an inadequate or negligent inspection." Syl. ¶ 5.

Plaintiffs, in their brief, assert that the City gratuitously assumed "a duty owed by the Bethel A.M.E. Church to third

parties, that being the plaintiffs' decedents." At the time the City was notified that the church was an unsafe structure, the church had already been inspected by Dressler Engineers, which found no imminent danger of the west wall collapsing. Again, the plaintiffs have failed to demonstrate any undertaking by the City on behalf of the Bethel Church. David Pennington was merely carrying out his duties on behalf of the City and no negligence is shown in his actions in posting the property as uninhabitable and directing the Bethel Church to proceed with repair or demolition. The City assumed no duty owed by the Bethel Church to the Pettises, and there is no showing that the actions taken by the City to protect the occupants of the church and parsonage and to prevent access to the church were in any way negligent. These actions do not constitute a gratuitous undertaking to render services to the Bethel Church but were a part of the duties prescribed by statutes and ordinances for the protection of the public. The record is devoid of any evidence which would support a finding that the City undertook to render services as required by § 324A.

Plaintiffs contend that there are controverted facts which precluded the granting of summary judgment. While it is true that plaintiffs point to some facts which are allegedly controverted, none of them are material to a resolution of this case. In *Ruebke v. Globe Communications Corp.*, 241 Kan. 595, Syl. ¶ 7, 738 P.2d 1246 (1987), we held:

"In order to preclude summary judgment, the facts subject to dispute must be material to the conclusive issues in the case. An issue of fact is not genuine unless it has legal controlling force as to a controlling issue. A feigned or imaginary issue is not a genuine issue. A disputed question of fact which is immaterial to the issues does not preclude summary judgment. If the disputed fact, however resolved, could not affect the judgment, it does not present a genuine issue of a material fact. *Busch v. City of Augusta*, 9 Kan. App. 2d 119, Syl. ¶¶ 4, 5, 674 P.2d 1054 (1983)."

We have carefully considered this voluminous record and conclude that such facts as are controverted are not material to the issues before the court and do not preclude summary judgment.

Finally, plaintiffs contend summary judgment was improper because the defendants "knew or should have known of danger to the Pettises." Plaintiffs rely upon *Fudge v. City of Kansas City*, 239 Kan. 369, 720 P.2d 1093 (1986), and *Balagna v. Shaw-*

*nee County*, 233 Kan. 1068, 668 P.2d 157 (1983). We find such reliance misplaced. Assuming these defendants had actual knowledge of a potential danger to the Pettises, which is not borne out by the record, nothing in *Fudge* or *Balagna* makes such knowledge standing alone actionable. Absent a duty there can be no negligence supporting the plaintiffs' claims. *Fudge* involved Restatement (Second) of Torts § 324A and the issue of whether police officers could be held liable to a third person for failing to take an intoxicated person into custody. It was only after the court found a duty mandated by the police department requiring that intoxicated persons be taken into custody that the court applied § 324A and made the following statement:

"The police officers should have realized that taking Henley into protective custody was necessary for the protection of third persons. Their failure to do so significantly increased the risk that Henley would cause physical harm to others. Accordingly, the City of Kansas City is subject to liability to James Fudge for the officer's failure to take Delmar Henley into custody." 239 Kan. at 373.

It is clear the court's language in *Fudge* parallels the requirements of § 324A. It is also clear that there was a specific set of guidelines or rules that the police officers were mandated to follow which created the duty to the plaintiff.

In *Balagna*, liability was found based upon actual knowledge of a dangerous condition coupled with a unique set of facts. The architect-engineer defendants in *Balagna* were fully aware of the construction contract and its requirements. They were also on the premises for the purpose of assuring that the terms of the construction contract were performed. In the performance of those duties, the defendant's employee, Freeborn, actually observed the contractor's failure to take appropriate safety precautions. At the time, Freeborn knew that the contractor's actions were in violation of safety regulations promulgated by OSHA and were a violation of standards which the contractor was obligated to perform. The unique factual circumstances of *Balagna* are not present in the instant case.

We conclude the trial court did not err in granting summary judgment to defendants.

The judgment is affirmed.