(883 P.2d 1204)

No. 69,800

EDITH M. ROGERS, LINDA K. BUCKLINGER, and GEORGE EARL ROGERS, JR., Individually and as Heirs at Law of GEORGE EARL ROGERS and MATTHEW L. ROGERS, and EDITH M. ROGERS, as Administratrix of the Estates of GEORGE EARL ROGERS and MATTHEW L. ROGERS, *Appellants*, v. OMEGA CONCRETE SYSTEMS, INC., a Kansas Corporation, *Appellee.*

Opinion filed June 17, 1994.

*Tim J. Moore,* of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, for the appellants.

*Michael J. Dutton,* of Wallace, Saunders, Austin, Brown & Enochs, Chartered, of Overland Park, for the appellee.

Before Lewis, P.J., Green, J., and James J. Smith, District Judge, assigned.

Lewis, J.: George Earl Rogers and Matthew Rogers were father and son. Matthew, at the time of his death, was employed by Omega Concrete Systems, Inc. (Omega). Since Matthew did not have a driver's license, George drove him to work nearly every day for several years. In order to deliver Matthew to the Omega job site, the parties had to travel over a private road on land owned by the Union Pacific Railroad Company (UP). This road was accessed by traveling down highway K-32 and then turning south. The private road also crossed the UP railroad tracks. On the tragic day which gave rise to these proceedings, George drove in front of a UP train, and both he and Matthew were killed. Blood tests performed on each man indicated that George had not been drinking prior to the accident but that Matthew had a blood alcohol concentration of .219. The heirs of George and Matthew brought this wrongful death action, seeking to recover damages from Omega, alleging that its negligence had caused or contributed to the accident. The plaintiffs previously settled with other named defendants, including UP, St. Louis Southwestern Railway, and the City of Kansas City, Kansas. The trial court granted summary judgment in favor of Omega, and the plaintiffs appeal.

The day of the fatal accident was bright and clear. At approximately 6:40 a.m., George turned off K-32 onto a private road leading to the Omega job site. This private road (hereafter road) ran across two UP railroad tracks; the crossing was within 145 feet of the entrance to the road, and the tracks had to be crossed to reach Omega.

There were eyewitnesses to the fatal accident. These witnesses observed the Rogers car turn onto the road at a speed of 15 to 20 miles per hour and proceed to the railroad crossing without stopping or slowing down. One witness observed George look to his left before reaching the crossing but testified that he never did look back to his right. The UP train was coming from the right side of the Rogers vehicle. The vehicle entered the crossing

without slowing down or stopping and was struck by the train. Both men were killed instantly.

The focus of the cause of action against Omega is a "Private Road Agreement" (hereafter Agreement) signed by Omega in 1973.

The evidence indicates that the railroad tracks had been at the location in question since 1888. The crossing, at the time of the accident, was very busy with trains passing over it at regular intervals.

The predecessor of Omega was a company known as Stewart Sand and Material Company (Stewart). Apparently, access to Stewart was difficult, and no road was available to reach the area. The result was that, in 1957, Stewart and UP entered into an Agreement which granted to Stewart "the right to construct and thereafter, during the term hereof, to maintain and use said Private Road across said right of way and over said tracks located thereon." In the agreement, Stewart is referred to as a "Licensee" and it is made apparent that Stewart "desire[d] the construction . . . of a private road." In 1974, Omega was made a party to the Agreement, and all references to obligations and duties under the Agreement will refer to Omega.

While Omega was to maintain the road under the terms of the Agreement, UP agreed to construct the crossing over the road at the expense of the licensee and agreed to install "traffic warning signs and whistling posts." UP did, in fact, install the signs and whistling posts. The evidence further indicates that, since 1974, all maintenance on the crossing itself was performed by UP.

There are two key provisions in the Agreement which the plaintiffs contend were violated by Omega. These key provisions read as follows:

**Private Road provision:** "It is expressly stipulated that the Private Road is to be a strictly private one and that it is not intended for public use, and the use thereof shall be limited to the Licensee and its employees, agents and patrons."

**Gates provision:** "The gates in the right of way fence affording access to the Private Road shall be kept closed by the Licensee

at all times, except during the time of actual passage through them onto or from the Private Road."

These sections and other pertinent language in the Agreement will be discussed later in this opinion.

The plaintiffs argue that the trial court erred in granting summary judgment to Omega.

## STANDARD OF REVIEW—SUMMARY JUDGMENT

The sole issue on appeal is whether the trial court erred in granting summary judgment to Omega. Plaintiffs argue that Omega had premises liability as a result of its standing under the Agreement. They also argue that Omega breached its agreement to keep the road private and to keep the gates closed. The plaintiffs argue that they are third-party beneficiaries under the Agreement.

The standard for summary judgment is well known and often stated:

"Summary judgment is proper if no genuine issue of fact remains, giving the benefit of all inferences which may be drawn from the admitted facts to the party against whom judgment is sought. A trial court, in ruling on motions for summary judgment, should search the record to determine whether issues of material fact do exist. When summary judgment is challenged on appeal, an appellate court must read the record in the light most favorable to the party who defended against the motion for summary judgment. [Citation omitted.]" *Finkbiner v. Clay County*, 238 Kan. 856, 857-58, 714 P.2d 1380 (1986).

"Summary judgment may be granted when the evidence shows no liability as a matter of law and where the central facts are not in dispute. [Citation omitted.] When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. [Citation omitted.] In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. An issue of fact is not genuine unless it has legal controlling force as to a controlling issue. A disputed question of fact which is immaterial to the issue does not preclude summary judgment. If the disputed fact could not affect the judgment, it does not present a genuine issue of material fact. [Citation omitted.]" *Knudsen v. Kansas Gas & Electric Co.*, 248 Kan. 469, 483, 807 P.2d 71 (1991).

" 'Summary judgment is proper where the only questions presented are questions of law. [Citation omitted.] To recover for negligence, the plaintiff must prove the existence of a duty, breach of that duty, injury, and a causal connection between the duty breached and the injury suffered. [Citation omitted.]' *McGee v. Chalfant*, 248 Kan. 434, 437, 806 P.2d 980 (1991). ' "Whether a duty exists

is a question of law. [Citations omitted.] Whether the duty has been breached is a question of fact." [Citation omitted.]' *Gooch v. Bethel A.M.E. Church*, 246 Kan. 663, 668, 792 P.2d 993 (1990). 'It was thus the obligation of the court in the first instance, and this court on appeal, to determine whether a duty existed. Without a duty, there could be no breach which would support plaintiff's claim.' *Hackler v. U.S.D. No. 500*, 245 Kan. 295, 297, 777 P.2d 839 (1989)." *Honeycutt v. City of Wichita*, 251 Kan. 451, 463, 836 P.2d 1128 (1992).

In its memorandum, Omega submitted some 158 uncontroverted facts. The plaintiffs controverted 18 of those facts. The facts involved were gleaned from 23 depositions, 3 affidavits, and numerous photographs and other exhibits marked and developed during discovery.

The trial court concluded that the uncontroverted facts in this case mandated a holding that Omega had no premises liability and violated no duty owed to the plaintiffs.

## PREMISES LIABILITY

The plaintiffs first assert that Omega is liable under a theory of premises liability. That theory is satisfactorily explained in 62 Am. Jur. 2d, Premises Liability § 6, p. 353 as follows:

"*Occupation, or possession, and control* is usually one of the attributes that must be shown as a basis for liability on the part of an owner or occupant of premises for injuries resulting from the condition of the premises. The liability of an occupant of real estate for injuries caused by a dangerous or defective condition of the premises depends generally upon his control of the property, whether or not he has title thereto and whether or not he has a superior right to possession of property which is in the possession and control of another." (Emphasis added).

Omega did not own any of the real estate on which the private road and crossing were located. The issue presented is one of control, not ownership. In a premises liability case, in order to be liable, the party charged must have had control over the premises in question. It is obvious that, without control, the responsibility for the dangerous or hazardous condition cannot exist. To put it another way, a party may not be held responsible for a condition which he or she did not cause and which he or she has no ability to remedy.

In this case, the trial court held that no premises liability could attach to Omega and stated:

"The accident did not occur on any premises owned or controlled by Omega. It occurred at a crossing over which Omega merely had a right to cross by virtue of its agreement with the railroad. Thus, any theories of premises liability advanced by plaintiffs can provide no basis for recovery against Omega. They simply don't apply to this set of facts. Any discussion as to whether plaintiffs were invitees or licensees of Omega is irrelevant."

We agree with the decision of the trial court as it applies to the crossing itself. We have examined the Agreement between Omega and UP and cannot find where it places any responsibility upon Omega to do anything with regard to the crossing. Omega simply has no right of control over the condition or safety of the crossing. The Agreement originally required Stewart to pay for the installation of the crossing but gave Stewart no further responsibility for the crossing. The element of control over the crossing, essential for premises liability, is lacking in this case. See *Strauss v. Missouri Pacific Rld. Co.*, 175 Kan. 98, 259 P.2d 145 (1953).

The uncontroverted facts support the conclusion of the trial court. Omega became a signatory to the Agreement in 1974. Since that time, it has performed no maintenance of any kind on the crossing, nor has it been billed for maintenance performance by UP. Only UP employees have authorization to perform work in the railroad right-of-way and on the crossing. The duty to provide warning signals at the crossing was exclusively that of UP, as provided by the Agreement in question. There is a total lack of evidence indicating that Omega had any right of control over the railroad crossing. Indeed, the evidence indicates that, as to the crossing, Omega was nothing more than a licensee of UP. Omega had obtained the right for its employees to cross at the crossing but had no further rights in or control over the crossing in question. See, *e.g.*, *Strauss v. Missouri Pacific Rld. Co.*, 175 Kan. 98. The actions and intent of the parties are relevant in interpreting the contract. *Fountain v. Se-Kan Asphalt Services, Inc.*, 17 Kan. App. 2d 323, 328, 837 P.2d 835, *rev. denied* 251 Kan. 937 (1992).

The trial court concluded that whether the crossing was hazardous was a question of fact. The plaintiffs' expert testified that it was, and the expert for Omega testified that it was not. How-

ever, in the absence of evidence that Omega had control over the hazards alleged, they became irrelevant insofar as the liability of Omega is concerned. The trial court did not err in holding that Omega had no liability as an owner or possessor of the railroad crossing where the accident occurred.

Omega did, however, have considerable control over the private road which led to the railroad crossing. Unlike the crossing, Omega undertook the responsibility for the maintenance of the private road. The evidence shows that this road existed primarily for the benefit of Omega and its employees. Under these circumstances, it could hardly be argued that Omega was not responsible for keeping the road in a safe condition for the benefit of its employees. Omega had the right and the duty to remedy dangerous conditions in the road itself.

In theory, Omega could have been subjected to premises liability with regard to the road it agreed to maintain. However, in fact, the evidence does not reveal the existence of any road defects which caused or contributed to the accident in question. For the purposes of our discussion, we treat the railroad crossing separate and apart from the private road. This is consistent with the Agreement, which requires Omega to maintain the private road but reserves the control over the railroad crossing in UP.

The expert witness employed by the plaintiffs executed an affidavit in which he set forth the conditions plaintiffs contended made the grade crossing extra hazardous:

"Based on my experience, personal inspection of the Private Road and crossing, and the 1986 FHWA Railroad-Highway Grade Crossing Handbook, the following conditions made the subject grade crossing extra hazardous:

(a) sight restrictions caused by trees and shrubs in three quadrants of the crossing;
(b) the relatively high-speed turns that are possible onto the Private Road from Route K-32;
(c) the closeness of the crossing to the K-32 intersection;
(d) the relatively high train speed and volume;
(e) the presence of multiple tracks;
(f) the lack of advance warning signs; and
(g) the lack of a positive control device."

Assuming the conditions listed above were hazards, they were

conditions over which Omega had no control. The trees which might have caused sight restrictions were not on land owned or controlled by Omega. There is no showing that Omega had any right to trim or cut down trees on land it did not own and could not enter. The relatively high speed turns from K-32 to the Private Road are clearly conditions over which the State, and not Omega, had control. The closeness of the crossing to the K-32 intersection was, again, not a hazard over which Omega had control. The crossing was located where the railroad wanted it, without regard to any desire on the part of Omega. The high train speed and volume and the presence of multiple tracks is, again, obviously nothing Omega could do anything about. The duty to post warning signs and the like was reserved to UP in the Agreement, and UP assumed and performed this duty. Under the circumstances shown, we conclude additional warning signs or devices were superfluous. The decedents traveled this road almost daily and knew of the existence of train tracks and traffic.

There are no road hazards associated with road maintenance alleged to be the cause of the accident. Thus, even assuming premises liability on Omega with regard to its duty to maintain the road, no violation of that duty is shown by the record.

## CONTRACTUAL OBLIGATIONS

The plaintiffs argue that Omega breached the "private road" clause in the Agreement. Even assuming that to be true, we see nothing in the record which could link the public use of the road and the proximate cause of the accident. The decedents' automobile was driven in front of a moving train and they were killed. That singular fact has no relationship to any public or private use of the road. We do not hesitate to affirm the trial court where the uncontroverted facts, on summary judgment, show no question of fact as to the contribution of a particular condition to the proximate cause of the accident.

The trial court in this case held as a matter of law that "[n]either the lack of gates or the failure of Omega to keep the road private contributed to the cause of this accident." We agree. There is nothing in this record which could support a finding that

the failure to keep the private road private caused or contributed to this accident. Indeed, the facts clearly fail to show any linkage between the two.

Plaintiffs argue that if the road were treated as a public road, the duties of Omega with regard to the road would be increased beyond the scope of the Agreement. The trial court, however, held that the Agreement did not impose any affirmative duty on Omega to insure that the public never traveled on the road. We agree. The Agreement provides that the road was not intended for public use and should be limited to use only by Omega and its employees, agents, and patrons. It does not state or even imply that either party to the Agreement had an affirmative obligation to enforce this provision. The road was kept private in the sense that it was always privately funded and maintained and no public funds were expended for such purposes. We agree with the trial court that the "private road" provisions of the Agreement do not afford any basis for imposing liability for this accident on Omega. We will not write a new agreement for the parties under the guise of construction. We enforce the Agreement as written. See *Fountain v. Se-Kan*, 17 Kan. App. 2d at 327.

The plaintiffs next assert that the "gates" provision of the Agreement was breached by Omega and that this breach was a cause of the accident. The Agreement provided: "The gates in the right of way fence affording access to the Private Road shall be kept closed by the Licensee at all times."

There is no question but that the gates were not closed immediately prior to the accident. In fact, no right-of-way fence or gates existed, having been torn down many years before Omega became a party to the Agreement. While Omega may have contractually undertaken a duty to keep the gates closed, it had no right or authority to build a right-of-way fence on real estate it did not own. The absence of any right or authority to build a new right-of-way fence made the "gates" provision of the Agreement impossible to perform. Under the circumstances, Omega was relieved of its obligation to keep the non-existent gates closed:

"The law has long since recognized that impossibility, or as stated by the more modern authorities, impracticability of performance *may* relieve a promisor of

liability for breach of contract. Such impracticability may arise after the contract, in which case it is referred to as 'supervening' or may exist at the time of the contract, in which case it is referred to as 'original' or 'existing.' " *Sunflower Electric Coop., Inc. v. Tomlinson Oil Co.*, 7 Kan. App. 2d 131, 138, 638 P.2d 963 (1981), *rev. denied* 231 Kan. 802 (1982).

Under the circumstances, we hold that Omega cannot be held responsible for the breach of a provision in a contract which it could not perform. Omega had no authority to enter onto the property of another and rebuild the right-of-way fence. As a result, the provision in question was rendered impossible to perform. Omega cannot be responsible for closing the gate on a non-existent fence it had no right to rebuild.

We hold the trial court did not err in granting summary judgment to Omega. The facts of this tragic accident are not complicated, and they are not in dispute. George Rogers drove in front of an oncoming locomotive, and he and his son, Matthew, were killed. The uncontroverted facts in this case do not create a question of fact as to the liability of Omega. The facts fail to show the breach of any duty owed by Omega to the decedents, and summary judgment is proper. Omega's only exposure to liability is as a licensee of a private road with a duty to maintain the road only. The crossing remained under the exclusive control of UP. The uncontroverted facts show that Omega did nothing which caused or contributed to the accident. The hazards which plaintiffs contend existed were not created by Omega, which had neither the requisite authority or control to correct the specified problems. We are unable to discern who was at fault in this accident. However, we do conclude Omega was not. There is nothing in the record to justify a trial as to the liability of Omega.

The plaintiffs finally argue that the trial court erred in finding that Omega breached no tort or contractual duty to the plaintiffs.

In general, whether a duty exists is a question of law, and whether that duty has been breached is a question of fact. *Gooch v. Bethel A.M.E. Church*, 246 Kan. 663, 668, 792 P.2d 993 (1990). The application of this rule renders summary judgment generally inappropriate for the determination of whether a particular duty has been breached.

The general rule, as most rules, is subject to exceptions. In this case, the uncontroverted facts leave no room to predicate liability or causation upon any action of Omega. Under those circumstances, it is not error to grant summary judgment. We see no resolution of any disputed questions of fact by the trial court. The facts do not support the imposition of liability on Omega. The decision of the trial court is affirmed.

Affirmed.