NOT DESIGNATED FOR PUBLICATION

No. 120,782

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STANLEY ALAN RITTER,
*Appellant*,

v.

GAS-MART USA, INC,
HEARTLAND RESTAURANTS, LLC,
and
SUMMIT RESTAURANT HOLDINGS, LLC,
*Appellees*.

MEMORANDUM OPINION

Appeal from Chase District Court; W. LEE FOWLER, judge. Opinion filed March 6, 2020. Reversed and remanded with directions.

*Thomas J. Dickerson*, of Dickerson Oxton, LLC, of Kansas City, Missouri, for appellant.

*Patric S. Linden*, *Kevin D. Case*, and *Michael C. Skidgel*, of Case Linden P.C., of Kansas City, Missouri, for appellee Gas-Mart USA, Inc.

*Janette C. Gaddie*, of Law Office of Pamela W. Brown, of Overland Park, for appellees Heartland Restaurants, LLC, and Summit Restaurant Holdings, LLC.

Before ARNOLD-BURGER, C.J., HILL and GARDNER, JJ.

PER CURIAM: Stanley Alan Ritter slipped on black ice in the semi-truck parking area at the Matfield Green Service Station on the Kansas Turnpike (Truck Stop). He filed a negligence action against the operators of the facilities at the Truck Stop, arguing they

breached a duty of reasonable care for failing to ensure the removal of the snow and ice from the parking lot. The district court granted summary judgment in the operators' favor, finding they owed no duty to address the snow and ice conditions in the semi-truck parking area because the plain language in their lease agreements with the Kansas Turnpike Authority (KTA) absolved them of responsibility for maintenance of the semi-truck parking area. Ritter appeals, arguing that (1) the district court improperly relied on inadmissible evidence in considering the summary judgment motion and (2) the district court erred because the operators' ownership, possession, or control of the area where Ritter fell was unclear given the ambiguity of the maintenance provisions in the lease agreements. After a careful review of the issues presented, we find that viewing the evidence in the light most favorable to the party opposing summary judgment, as we must do, there are material issues of fact remaining that preclude summary judgment at this stage of the proceedings. As a result, we reverse and remand for further proceedings.

FACTUAL AND PROCEDURAL HISTORY

On a winter evening in 2014, Ritter parked his tractor-trailer in the semi-truck parking lot at the Truck Stop. While performing a pretrip inspection on his tractor-trailer the next morning, Ritter slipped on black ice, suffering injuries.

Ritter timely filed a personal injury lawsuit, asserting negligence claims against, among others, the parties to this appeal:  Gas-Mart USA, Inc., who operated the gas station; and Heartland Restaurants LLC and Summit Restaurant Holdings LLC, who operated the Hardee's and Dunkin' Donuts food services (Operators). Ritter argued the Operators owed a duty of reasonable care to maintain the parking lots and to ensure they were in a reasonably safe condition for customers and members of the public and they breached their duty by failing to address or remove the ice from the parking lot resulting in Ritter's injuries.

2

Heartland and Summit (Heartland) filed a joint answer in February 2016, asserting as an affirmative defense that Ritter's petition failed to state a claim upon which relief could be granted because Heartland did not have a responsibility to maintain the semi-truck parking area where Ritter fell. Shortly thereafter, Gas-Mart submitted a notice of bankruptcy, ultimately leading to an automatic stay order by the district court that remained in effect for a year.

During the stay, Ritter's counsel contacted Alan Streit, the general counsel for KTA, to request the original version of the lease agreement entered by KTA and Gas-Mart (Gas-Mart Lease). Streit first emailed a color copy of the Gas-Mart Lease that included a black and white copy of the Matfield Green and Towanda Service Area Map (Map). Ritter's counsel emailed back to request "an exact color copy" of the Gas-Mart Lease. The next day, Streit sent Ritter's counsel the same copy of the original Gas-Mart Lease along with a yellow highlighted Map.

The case proceeded toward resolution after the bankruptcy court granted Ritter's motion to lift the stay. Gas-Mart submitted its answer asserting similar defenses as Heartland, specifically Gas-Mart did not owe Ritter a duty of reasonable care because Gas-Mart did not control or have responsibility over the semi-truck parking lot area where Ritter fell.

Later that month, Ritter served a subpoena on KTA requesting "[a]n exact color copy" of the Gas-Mart Lease. Robert Pettersen, a KTA credit manager and authorized custodian of records, submitted the copy and an affidavit as requested.

*Heartland moves for summary judgment.*

Just a month later and well before the end of discovery, Heartland moved for summary judgment. The motion asserted that Ritter failed to state a claim upon which

3

relief could be granted because the semi-truck parking area where Ritter fell was not owned, operated, or under Heartland's control. Heartland argued in a memorandum supporting its motion that the lease between them and the KTA (Heartland Lease) did not include the semi-truck parking area in its designated area of responsibility, so they owed no duty of care to Ritter.

Ritter responded to Heartland's motion, generally objecting to the copy of the Heartland Lease included with Heartland's motion for summary judgment and asserting that a genuine factual dispute existed about the contents of the original lease because of the varying versions produced during discovery. Ritter also asserted that the versions of the Heartland Lease and an Operations and Use Agreement (OUA) attached to Heartland's motion were not authenticated, thus making them inadmissible evidence. He also submitted that Pettersen could not authenticate the documents because he lacked personal knowledge and was not a competent witness based on his admitted mishandling of records.

Ritter also disputed that Heartland was entitled to judgment as a matter of law. He argued the Heartland Lease did not effectively release Heartland from its duty of reasonable care as an occupier of the Truck Stop. Last, Ritter noted that even if the semi-truck parking area where his injuries occurred had been KTA's sole responsibility, the Heartland Lease still required Heartland to notify KTA "of the occurrence of any event or condition, the responsibility or maintenance of which rests with the [KTA]."

In its reply, Heartland generally asserted that none of Ritter's factual claims were relevant or material because he had received a copy of the Heartland Lease in August 2016 which contained the map attachment showing Heartland had no responsibility for the semi-truck parking area. Finally, Heartland continued to assert it was entitled to summary judgment.

4

Ritter filed a surreply asserting that Heartland's response contained factual inaccuracies. Ritter claimed that the communications with KTA counsel during the bankruptcy stay did not involve the Heartland Lease at all because those communications were only about the Gas-Mart Lease. Ritter repeated his objections to the authenticity of the copy of the Heartland Lease referenced in Heartland's motion for summary judgment, asserting there remained a factual dispute about which document constituted the original Heartland Lease from 2013. Ritter continued his challenge over whether Pettersen's affidavit was proper since Pettersen was not a corporate representative for KTA. Finally, Ritter reiterated his arguments that the Heartland Lease imposed a duty upon Heartland, including "the duty to notify the KTA of conditions, the maintenance or responsibility for which lie with the KTA."

*Gas-Mart moves for summary judgment.*

In August 2018, before the district court ruled on Heartland's motion, Gas-Mart filed its own motion for summary judgment, asserting it owed no duty to Ritter because the area where he fell was not on premises leased by Gas-Mart. In a memorandum supporting its motion, Gas-Mart asserted essentially the same uncontroverted facts related to Ritter's fall in the semi-truck parking area at the Truck Stop as in Heartland's motion for summary judgment.

Likewise, Gas-Mart argued it was entitled to judgment as a matter of law on Ritter's negligence claim because the Gas-Mart Lease did not grant Gas-Mart possession or control of the semi-truck parking stalls where Ritter fell. As a result, Gas-Mart argued it owed no duty of care to Ritter. Gas-Mart attached several exhibits to its memorandum to support its motion for summary judgment but mainly relied on three exhibits:

- Exhibit 5, a 16-page copy of the Gas-Mart Lease, which Gas-Mart asserted was a copy of the document taken from the KTA's physical file produced at

Pettersen's deposition. This copy of the Gas-Mart Lease included a Bates number stamp in the bottom right from GMU 000034 through GMU 000048. The exhibit also included a copy of the Truck Stop map attachment with a yellow-highlighted rectangle designating "OPERATORS AREA OF RESPONSIBILITY MARKED IN YELLOW."

- Exhibit 6, a copy of the Truck Stop map attachment. This copy depicted the same map as included in Exhibit 5.

- Exhibit 7, portions of the Pettersen deposition transcript taken in February 2018. Gas-Mart asserted that Pettersen "testified that he personally colored in the yellow area of the Service Area Map, and personally made the handwritten notations on the Service Area Map before the Lease was executed." Citing Exhibits 6 and 7 as support, Gas-Mart asserted that "the parking stalls for semi-trucks and trailers in the area surrounding the parking stalls on both the east and west sides of the building are not located within [Gas-Mart]'s area of responsibility in yellow, and thus are in the area of the KTA's responsibility."

Ritter objected on the basis that the version of the Gas-Mart Lease relied on in Gas-Mart's motion for summary judgment was not a true and accurate copy of the Lease, and he asserted that Gas-Mart's Exhibit 5 was inadmissible under the best-evidence rule. Ritter also generally objected to the copy of the Gas-Mart Lease as included in Exhibit 5, asserting that a genuine factual dispute existed because the versions of the lease provided by Gas-Mart in discovery did not include any map attachment. Ritter continued in his objection over whether Pettersen could authenticate the Gas-Mart Lease as a nonparty.

6

*District court grants summary judgment.*

The district court conducted a hearing on Heartland's motion for summary judgment in August 2018, only three days after Gas-Mart moved for summary judgment. Ultimately, the district court found that summary judgment was warranted in Heartland's favor based on the undisputed Heartland Lease and Map, which showed that Heartland did not owe a duty to Ritter to maintain or control the site where he fell. In the journal entry, the district court made the following factual findings and conclusions of law:

"1.     [Ritter's] Petition, filed on January 5, 2016, asserted a sole cause of action for negligence against [Operators] alleging that on January 11, 2014, Plaintiff Stanley Ritter was injured when he slipped and fell on black ice while performing a pre-trip inspection of his tractor-trailer where it was parked at the [Truck Stop] on the Kansas Turnpike near El Dorado, Kansas.

"2.     [Ritter's] Petition further alleged that all [Operators] were the owners and/or operators of the businesses at the [Truck Stop], had control and maintenance over the area where the fall occurred, and had a duty to exercise reasonable care in the maintenance of the parking lots on their property to ensure the lots were reasonably safe for customers and members of the public having access to those areas.

"3.     During his deposition, [Ritter] testified about the location of his fall, and marked on Ritter Deposition Exhibit 6, an outer circle to designate the general area where he parked, and an inner circle to designate the area where he fell.

"4.     [Ritter] testified he did not fall on the sidewalk, in the area of the car parking stalls in front of the building on the west side of the [Truck Stop] or in the drive area between the semis [truck and trailers] and the car parking stalls.

"5.     [Heartland] filed a motion for summary judgment on the grounds [Ritter's] claims are barred for failure to state a claim upon which relief can be granted because

7

[Heartland] did not own, possess or control the semi-truck parking lot where [Ritter] stated he fell and therefore [Heartland] were not responsible for [Ritter's] injuries and damages.

"6.    In support of the motion for summary judgment, [Heartland] attached a copy of the [Heartland Lease] which . . . states that 'The Operator's area of responsibility at the service area (cleaning and policing, liability, replacement, repair and maintenance) is specified in the attached [Map].'

"7.    The [Heartland Lease] was assigned in December 2013 by Rising Stars, LLC to HR Group MO, LLC (which subsequently changed its name to Heartland Restaurants, LLC), and the KTA executed its Landlord Consent and Estoppel in February 2014 and its Assumption and Consent on or about October 27, 2015.

"8.    Pursuant to the [Heartland Lease], the [Map] defined the Operator's Area of responsibility for cleaning and policing, liability, replacement, repair and maintenance as the yellow area on the Map.

"9.    Pursuant to the [Heartland Lease], the parking stalls for semi-trucks and trailers in the area surrounding the parking stalls on both the east and west sides of the building were not included in the designated area of responsibility for the Operators.

"10.    The area where [Ritter] testified he fell was not within the designated area of responsibility for [Heartland], but rather the KTA.

"11.    Contrary to arguments raised by [Ritter] in his Reply, Sur-Reply, and oral argument by counsel, the Court finds the operative [Heartland Lease], which had been assigned, made it clear that [Heartland] did not control and were not responsible for cleaning and policing, liability, replacement, repair and maintenance of the semi-tractor trailer parking lot where [Ritter] fell. Since the Court finds the operative [Heartland Lease] itself was unambiguous, the [Map] attachment is immaterial.

8

"12.     The KTA was entitled to enter into agreements with its tenant operators (and their assignees) to designate areas of responsibility for the operators and those areas of responsibility retained by the KTA. See *Hall v. Quivira Square Development Co.*, 9 Kan. App. 2d 243, 244, *review denied* 235 Kan. 1041 (1984), in which the Kansas Court of Appeals upheld a summary judgment in favor of a shopping center tenant on the basis that the tenant owed no duty of safety to an invitee who was injured in a parking lot that was under the control of the shopping center owner. The appellate court examined the lease agreement between the tenant in the shopping center, which designated that the parking lot (among other places) [was] a common area for use of all the shopping center tenants. *Id.* at 244. Further, the lease provided that the shopping center had sole responsibility to make all repairs and perform all maintenance work in those areas. *Id.* The *Hall* Court ultimately held that 'the shopping center landowner . . . by its lease retained control and had the duty to maintain the common area, which included the driveway and parking area where plaintiff fell, and which was under the exclusive possession and control of [the shopping center].' *Id.* See also *Rogers v. Omega Concrete Systems, Inc.*, 20 Kan. App. 2d [1, 883] P.2d 1204 (Kan. App. 1994).

"13.     A plaintiff in a premises liability negligence action must prove 'the existence of a duty, breach of that duty, injury, and a causal connection between the duty breached and the injury suffered.' *Rogers*[, 20 Kan. App. 2d 1], *supra, citing McGee v. Chalfant*, 248 Kan. 434, 806 P.2d 980 (Kan. 1991). 'Whether a duty exists is a question of law. Whether the duty has been breached is a question of fact.' *Id., citing Gooch v. Bethel A.M.E. Church*, 246 Kan. 663, 792 P.2d 993 (Kan. 1990). 'It was thus the obligation of the [trial] court in the first instance . . . to determine whether a duty existed. Without a duty, there could be no breach which could support plaintiff's claim.' *Id., citing Hackler v. U.S.D. No. 500*, 777 P.2d 839 (1989) and *Honeycutt v. City of Wichita*, 251 Kan. 451, 836 P.2d 1128 (Kan. 1992).

"14.     Based on the factual findings and conclusions of law set forth above, and after considering the pleadings filed in support of and in opposition to the summary judgment motion, including exhibits, and oral argument of counsel, which are all

9

incorporated herein by reference, as well as a transcript of the hearing which [Ritter] has requested, the Court concludes there is no genuine issue of material fact to dispute that [Heartland] owed a duty of care to [Ritter] for the area where he reported he fell. Rather, the KTA had possession and control over the area where [Ritter] testified he fell. Thus, as a matter of law, [Ritter] cannot establish the required element of the existence of a duty for his negligence cause of action against [Heartland], which would allow the cause of action to go to a jury."

The district court granted Gas-Mart's motion for summary judgment four months later in a memorandum decision adopting the findings of fact and conclusions of law in the Heartland summary judgment order.

Ritter timely appeals from both rulings.

ANALYSIS

*I. The district court erred in granting summary judgment to the Operators.*

Ritter argues that because there were disputed issues of material fact about the Operators' snow and ice removal obligations under the Gas-Mart and Heartland Leases, the district court erred by granting summary judgment in Operators' favor. In response, Operators assert there are no disputes of material fact from which a fact-finder could determine Operators owed a duty of care to remove snow or ice from the semi-truck parking area at the Truck Stop.

A.      *Our standard of review is de novo.*

After parties to a dispute have had a chance to discover evidence, but before their case goes to trial, a party may submit a motion to the trial court seeking summary judgment. K.S.A. 2019 Supp. 60-256. The party seeking summary judgment must show,

10

based on both parties' evidence, that there is no dispute as to any material fact and that they are entitled to judgment as a matter of law. In other words, the moving party—here the Operators—must show that there is nothing for the fact-finder to decide that would make any difference to the outcome of the case. See *Armstrong v. Bromley Quarry & Asphalt, Inc.*, 305 Kan. 16, 24, 378 P.3d 1090 (2016).

The party opposing summary judgment, in this case Ritter, must point to evidence questioning some material fact. If he does, then summary judgment must be denied so a fact-finder can resolve the dispute. When ruling on a summary judgment motion, the district court must view the evidence in the light most favorable to the party opposing the motion—Ritter. On appeal from the grant of summary judgment, we apply the same standards the trial court applied. See *Fawcett v. Oil Producers, Inc. of Kansas*, 302 Kan. 350, 358-59, 352 P.3d 1032 (2015). Because entry of summary judgment amounts to a question of law—it entails the application of legal principles to uncontroverted facts—we owe no deference to the trial court's decision, and our review is unlimited.

Resolving the summary judgment issue here also involves the interpretation of the lease agreements between the Operators and the KTA. "[W]e exercise unlimited review over the interpretation and legal effect of written instruments, and we are not bound by the lower courts' interpretations of those instruments." *Prairie Land Elec. Co-op v. Kansas Elec. Power Co-op*, 299 Kan. 360, 366, 323 P.3d 1270 (2014). Whether a written instrument is ambiguous is a question of law subject to de novo review. *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 964, 298 P.3d 250 (2013).

Finally, to recover for negligence, Ritter must prove by a preponderance of the evidence the existence of a duty, breach of that duty, injury, and a causal connection between the duty breached and the injury suffered. Whether a duty exists is a question of law. Whether the duty has been breached is a question of fact. See *Williams v. C-U-Out Bail Bonds, LLC*, 310 Kan. 775, 450 P.3d 330, 340 (2019). Summary judgment in a

11

negligence action is generally proper if the only questions presented are questions of law. *Martin v. Naik*, 297 Kan. 241, 245, 300 P.3d 625 (2013).

The sole basis for the district court's summary judgment order and the only issue before us is whether the Operators had a legal duty to remove snow and ice from the semi-truck parking area at the Truck Stop. If they had no duty to remove snow and ice from the semi-truck parking area, then summary judgment was proper. If they had a duty or if there is insufficient evidence at this stage of the proceeding to determine whether they had a duty, then summary judgment was in error. We will first examine the general common law duty related to premises liability and then we will examine the unique contract provisions that override that common law duty.

B. *We review the common law of premises liability.*

Ritter contends the Operators, as occupiers of the land at the Truck Stop, owed a general duty of reasonable care and had a legal duty to maintain land at the Truck Stop because it was in their possession or control. This claim accords with Kansas caselaw.

> "[T]he general rule in Kansas is that the owner or occupier of real property owes a duty to business invitees to maintain the premises in a reasonably safe condition. When real property is leased to a tenant, the duty to maintain is on the lessee. It is equally well settled that a lessor is liable for failure to maintain the leased area retained for the common use of the lessor's tenants when the tenants and their customers are merely entitled to use the common area." *Hall v. Quivira Square Development Co.*, 9 Kan. App. 2d 243, 244, 675 P.2d 931, *rev. denied* 235 Kan. 1041 (1984) (shopper fell due to uneven pavement in parking lot at retail mall).

Without a definition in the lease agreement, a common area may be defined as that area used in common by different tenants and their respective guests or invitees. See *Trimble v. Spears*, 182 Kan. 406, 409, 320 P.2d 1029 (1958).

12

Ritter also asserts that the Operators had a legal duty to warn of any dangerous condition that is either known to them or in the exercise of reasonable care should be known to them. This too has support in Kansas caselaw. "[T]he key to ascertaining the liability of a landlord and tenant for failure to maintain or failure to warn of a defect in a common area is who occupies the common area with the intent to control it." *Hall*, 9 Kan. App. 2d at 244.

The Operators agree that these underlying statements of law are well-settled. All parties agree that the location where Ritter fell was the semi-truck parking lot on the west side of the Truck Stop in a common area where semi-trucks park—separate from the passenger car parking area next to the Operators' businesses.

But we agree with the Operators that the commercial lease provisions negotiated at arm's length by the parties govern over any common law doctrine related to premises liability. See *Talley v. Skelly Oil Co.*, 199 Kan. 767, Syl. ¶ 1, 433 P.2d 425 (1967); *TMD Southglen II, LLC v. Parker*, No. 109,484, 2014 WL 2589768, at *5 (Kan. App. 2014) (unpublished opinion). Because the leases set out the respective duties of the Operators for maintenance and snow removal, Ritter's claim rests on the interpretation of the leases.

C.      *We review the provisions of the lease agreement as they apply to snow removal.*

Whether the Operators owed a duty to Ritter depends on whether they exercised ownership, possession, or control over the semi-truck parking lot at the Truck Stop. Specifically, we must determine whether the Operators were responsible for removing snow and ice from the location where Ritter fell under their respective lease agreements.

"'The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined

13

from the language of the contract without applying rules of construction.'" *Peterson v. Ferrell*, 302 Kan. 99, 104, 349 P.3d 1269 (2015). Additionally,

> "'[a]n interpretation of a contractual provision should not be reached merely by isolating one particular sentence or provision, but by construing and considering the entire instrument from its four corners. The law favors reasonable interpretations, and results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided. [Citation omitted.]'" *Waste Connections*, 296 Kan. at 963.

Both the Heartland Lease and the Gas-Mart Lease contain the same language about snow removal, maintenance, and repair, so there is no need to examine them separately.

The leases reference and incorporate the Map. The leases state: "The drawing is furnished for the purpose of showing the service area layout and the Operator's area of responsibility." The Map depicted a topographical view of the Truck Stop with a yellow-highlighted rectangle encompassing the restaurant, retail fuel establishment facilities, and the surrounding parking lots. The Map states on its face that it is identifying "Operators area of responsibility for cleaning and policing, liability, replacement, repair and maintenance. Operators area of responsibility marked in yellow. KTA will be responsible for the area not marked in yellow." The semi-truck parking area is clearly not in the Operators' area of responsibility as designated on the Map. So we look to the lease to see how snow and ice removal is treated.

The pertinent provision of the lease at issue is in numbered paragraph 10.

"10.    <u>Maintenance and Repairs</u>: This section is divided into three general categories: (a) buildings and related equipment; (b) retail fuel establishment equipment; (c) leased premises.
. . . .

14

"(a)  Building and related equipment:  This category shall include the service area building, water supply, heating and air conditioning system, sewage disposal systems and garbage disposal units. Unless otherwise stated, the operator is reasonable for the maintenance of the facility inside *their area of responsibility (per the attached [Map])*.

. . . .

"(b)  Premises:  The Operator's *area of responsibility* at the service area (cleaning and policing, liability, replacement, repair and maintenance) is *specified in the attached* [*Map*]. Operator agrees to maintain the premises inside their designated area of responsibility in an attractive, clean, safe, and sanitary manner. Operator shall police the areas outside the building, including entranceways, any patio area, and *adjacent sidewalks*. Planting of shrubs, cutting of grass, and other landscaping shall be the responsibility of Operator.

"The Operator shall be responsible for maintenance and replacement of *sidewalks and curb areas within areas defined in this contract* to be maintained by Operator. The Operator is responsible for maintenance and policing of trash containers inside the defined area and dumpster areas including the dumpster enclosure. The Operator is responsible for any debris, trash, or damage caused by lack of attention to maintenance requirements specified in this contract.

"The Operator agrees to maintain janitorial services to keep all portions of the service area inside their designated *area of responsibility (per the attached [Map])* clean and attractive at all times, to make adequate arrangements for the collection of garbage, papers and trash, hosing down entrances and exits and such other arrangements for general good housekeeping, which may be necessary. All trash and garbage removal shall be at the expense of the Operator. The Operator further agrees to maintain the interior lighting of the service area building, outside lighting on the building, and lighting in the motor fuel vending area.

"The [KTA] agrees to maintain their designated area of responsibility *(per the attached [Map])* including the asphalt pavement, service roads, sewage distribution system outside the physical dimensions of the leased area, and major grass cutting ordinarily done by farm type tractors. Please note that all repair and

15

replacement of the asphalt parking lot (inside and outside of the physical dimensions of the leased area) will be the responsibility, and at the expense, of the [KTA]. The Operator agrees to maintain all other exterior structures including but not limited to the exterior of the building and including but not limited to all maintenance functions hereinafter set out. IT IS EXPRESLY UNDERSTOOD BETWEEN THE PARTIES THAT MAINTENANCE IS THE RESPONSIBILITY OF THE OPERATOR *EXCEPTING ONLY THOSE LIMITED AREAS OF MAINTENANCE EXPRESSLY ASSUMED HEREIN BY THE [KTA].* FURTHER, NOTHING IN THIS PARAGRAPH SHOULD BE CONSTRUED TO EXCLUDE OPERATOR'S LIABILTY FOR DAMAGES DONE TO THE PROPERTY MAINTAINED BY THE [KTA] IF SUCH DAMAGE WAS A RESULT OF THE OPERATIONS OF THE OPERATOR. THIS WOULD NOT INCLUDE NORMAL WEAR AND TEAR OF THAT PROPERTY MAINTAINED BY THE [KTA]. THE [KTA] IS RESPONSIBLE FOR ANY DAMAGE RESULTING FROM THE OPERATIONS OF THE [KTA].

"[KTA] is responsible for snow removal *on the principal roadway of the Turnpike* and from the *service area roads (ingress and egress)*. It is the responsibility of the Operator to remove all snow promptly from *the areas used by it, including the parking lot and sidewalks*. The Operator must provide the [KTA] with a copy of any contract evidencing that a third party will perform the snow removal that the Operator is responsible for. The Operator shall commence and complete its portion of snow or ice removal whether or not the [KTA]'s portion is commenced or completed.

"IN THE EVENT MAINTENANCE, SNOW REMOVAL, LANDSCAPING, GRASS CUTTING, OR ANY OTHER OPERATING FUNCTION IS NOT DISCHARGED IN A TIMELY FASHION AFTER NOTICE TO THE OPERATOR, THE [KTA] MAY UNDERTAKE THE SAME AND THE OPERATOR AGREES TO REIMBURSE AT TWICE THE [KTA]'S COST.

"It also shall be the responsibility of Operator to notify [KTA] of the occurrence of any event or condition, the responsibility or maintenance of which rests with the [KTA]." (Emphases added.)

D.    *The parties disagree about the interpretation of the contract, creating genuine issues of material fact.*

The parties disagree about the meaning of snow removal language in the leases. A written instrument cannot be ambiguous unless two or more meanings can reasonably be construed from the contract. The court will not strain to find an ambiguity where, in common sense, there is none. *Iron Mound v. Nueterra Healthcare Management*, 298 Kan. 412, 418, 420, 313 P.3d 808 (2013). Here, we find the lease is ambiguous, because two or more meanings can reasonably be construed from the contract language.

Ritter asserts that the Operators' lease agreements with the KTA place snow and ice removal responsibilities over the entire parking lot on Operators, so they owed a legal duty over that area based on their leases, including the semi-truck parking lot at the Truck Stop where he fell. We find support for Ritter's position in the contract for five reasons:

1.  The leases expressly incorporate the Map as it relates to the building, cleaning, policing, liability, replacement, repair, maintenance, and janitorial services. But it does not incorporate the Map in the discussion of snow removal.

2.  The Map conveys on its face that it is designating the Operators' area of responsibility for cleaning, policing, liability, replacement, repair, and maintenance. But again, there is no mention of snow removal.

3.  The leases discuss maintenance and snow removal in the same sentence, so they must be separate concepts. This would allow the reader to conclude that

17

snow removal is not simply a subset of maintenance. And this makes sense, because if snow removal is simply a subset of maintenance, there would be no need for a snow removal provision at all.

4. The leases specifically limit KTA's responsibility for snow removal to the turnpike roads and the ingress and egress roads. So it expressly excludes the parking areas. Yet the same provision holds the Operator responsible for parking lots and sidewalks. In other areas of paragraph 10 the leases designate "curb areas" or "adjacent sidewalks" "within areas defined in this contract to be maintained by Operator." The snow removal provision does neither—an indication that all parking lot snow removal is the responsibility of the Operators.

5. Finally, KTA agreed to repair and replace all of the asphalt parking lot—inside and outside of the physical dimensions of the leased area. So on the one hand, KTA's maintenance responsibilities were similarly tied to the Map related to the asphalt pavement and service roads depicted on the Map. But on the other, the parties chose to place sole repair and replacement responsibility over the *entire* parking lot on the KTA. Then when addressing snow removal, the leases only required the KTA to remove snow from "the principal roadway of the turnpike and from the service area roads," while the Operators had to remove snow from "areas used by [them], *including the parking lot*." (Emphasis added.) So the leases do seem to provide some varying responsibilities inside and outside the area designated on the Map.

Ritter also asserts the leases' references to "area of responsibility" do not equate to the property occupied, possessed, or controlled by the Operators because the leases do not connect "area of responsibility" with the "leased area." He also notes that the leases do not explicitly define common areas.

18

We find Ritter's argument that a reasonable interpretation of the leases would expand the "leased area" to include the entire Truck Stop unpersuasive. The parties to these leases clearly intended for the Operators to perform some maintenance over an "area of responsibility" that only included the parking spaces, sidewalks, and other exterior features immediately surrounding each business. In other words, unlike in *Hall*—a case relied on by Operators—KTA did not retain exclusive control over these "common areas" within the designated areas of responsibility. The Operators would owe a duty of reasonable care within those areas for some of the specified maintenance tasks.

The Operators disagree that they had a duty of care to Ritter. They assert that the leases showed the Operators only agreed to be responsible for a specific, designated area around the buildings as depicted on the Map which was incorporated in the Heartland and Gas Mart Leases. And because most of the paragraphs in the "Maintenance and Repairs" section of their leases included clear references to the Map and the Operators' "designated area of responsibility" depicted on it, the Operators argue the only reasonable interpretation of the snow removal provision is that they were not responsible for snow removal outside their designated area of responsibility on the Map. In support of their arguments, the Operators assert the outcomes of *Summers v. Montgomery Elevator Co.*, 243 Kan. 393, 757 P.2d 1255 (1988), and *Hall* dictate that we should reach similar rulings here. We disagree.

Hall fell in the parking lot of a drugstore on property leased from Quivira Square, the landowner. A panel of this court held that the lease agreement showed that the landowner retained control over common areas, which included the parking area where Hall sustained her injuries. *Hall*, 9 Kan. App. 2d at 244. Summers sustained injuries in a service elevator at a shopping mall and filed a personal injury lawsuit against a store tenant at the shopping mall. The Kansas Supreme Court, relying on *Hall*, held that Summers was precluded from recovery because the elevator was not located on the

store's leased property. As a result, the owner of the shopping mall retained all ownership, control, and duty to maintain the elevator. *Summers*, 243 Kan. at 399-400.

We find neither case to be persuasive because there was no indication in *Hall* or *Summers* that the lease required any responsibility of the lease over common areas. Here the lessees were responsible for some common areas under the lease, whether it be adjacent common areas and parking for general maintenance or the entire common area for snow removal.

Although the district court ultimately concluded no Operator owed a duty of care to Ritter because the lease agreements unambiguously showed that the KTA had possession and control over the area where Ritter testified he fell, we are not bound by the district court's interpretations. See *Born v. Born*, 304 Kan. 542, 554, 374 P.3d 624 (2016).

After construing and considering the entire instrument, at least two reasonable interpretations emerge for the omission of an express reference to the Map and its depicted "designated area of responsibility" in the snow and ice removal section. Under the interpretation favored by the Operators, the express incorporations of the Map into the preceding maintenance provisions reflect that the Map is an integral part of the lease. According to Gas-Mart, it would be illogical to extend the Operators' snow removal responsibilities beyond the area designated in the map because the previous references to the Map created a clear and consistent demarcation between the Operators' and the KTA's areas of possession, control, and maintenance responsibilities. This is a reasonable interpretation because the parties' maintenance obligations would be clearly defined in the lease agreements' terms and the KTA and Operators could use the Map as a guideline for each party's "designated area of responsibility" if disputes arose.

20

Yet as Ritter points out, each of the maintenance provisions that reference the Map is also included in the language printed on the Map itself. As a result, Ritter argues had the parties intended for the Map also to govern snow removal responsibilities, the parties would have placed snow removal language on the Map or otherwise referenced the Map in the snow removal provision. Ritter also notes that the maintenance provisions state that the Operators would be responsible for maintenance excepting only the limited areas assumed by the KTA. Because the KTA only expressly assumed snow removal responsibilities over the service area roads and the turnpike, while the Operators agreed to remove snow and ice from "areas used by [them], including the parking lot," the snow and ice removal responsibilities in the semi-truck parking area fell upon Operators.

So, one reasonable interpretation of these provisions is that snow removal falls within the general "maintenance" that the Operators must perform strictly based on the areas designated on the Map. Another reasonable interpretation is that the parties intended for the Operators to be responsible for removing snow from the *entire* parking lot, including the areas inside and outside of the physical dimensions of the leased area.

Because the lease provisions are capable of two interpretations, they are ambiguous. So we turn to the purpose of the lease agreements in an effort to determine the parties' intent. See *Waste Connections*, 296 Kan. at 963. Because the leases' language is ambiguous, we may consider extrinsic or parol evidence to construe it. See *Barbara Oil Co. v. Kansas Gas Supply Corp.*, 250 Kan. 438, 452, 827 P.2d 24 (1992); *Mobile Acres, Inc. v. Kurata*, 211 Kan. 833, 838-39, 508 P.2d 889 (1973). If we cannot determine the intent of the parties from undisputed extrinsic or parol evidence, then summary judgment is inappropriate. *Waste Connections*, 296 Kan. at 963-64.

The stated purpose of the agreements is clearly expressed in the opening paragraphs. The Operators agreed to lease the restaurant facility and the retail fuel establishment "to meet the need of the traveling public for items customarily sold at

21

[restaurants or retail fuel establishments] and for services customarily rendered thereby." Along with that purpose, the Operators generally agreed throughout the maintenance and repairs section to maintain the premises "in an attractive, clean, safe, and sanitary manner."

The Operators' interpretation as stated in their motions and briefs would impair that purpose. Given the nature of the Truck Stop as a retail fuel establishment, restaurant facility, and rest area along the Kansas Turnpike, semi-truck drivers like Ritter would be expected to use this Truck Stop and others like it. As a result, requiring the Operators to remove snow and ice from "areas used by [them]" would reasonably extend to include those areas where patrons who wish to purchase items or services from the Operators could park their vehicles. For these reasons, consistent with Ritter's interpretation, the parties reasonably may have intended for the Operators to be responsible for removing snow in the semi-truck parking area.

Here, discovery had barely begun when the Operators filed their motions for summary judgment. Ordinarily, summary judgment should be granted only when discovery is complete. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106, *cert. denied* 571 U.S. 826 (2013). Without additional evidence, particularly regarding the intent of the parties, genuine issues of material fact remain. See *Noller v. General Motors Corp.*, 244 Kan. 612, 617, 772 P.2d 271 (1989) (noting courts should be cautious in granting summary judgment where issues involve questions of parties' intent); *Sheldon v. Hunam Restaurant of Manhattan, Inc.*, No. CIV. A. 88-2157-S, 1989 WL 151923, at *2 (D. Kan. 1989) (unpublished opinion) (finding control over common area may require factual determination, factual issue existed regarding intent behind lease agreement, and whether defendant had duty to plaintiff was not fully developed).

22

Because the district court based its grant of summary judgment on a finding that the Operators lacked any duty as a matter of law, its decision was in error. As a result, we reverse the district court's grant of summary judgment to the Operators and remand the case for further proceedings.

E.  *Even if the KTA was responsible for removing the snow from the semi-truck parking area, the Operators also had a separate duty to notify the KTA.*

Ritter maintained in his pleadings before the district court that even if the KTA had sole responsibility to remove the snow and ice from the semi-truck parking area where he fell, the Maintenance and Repairs section provided "[i]t also shall be the responsibility of [Operators] to notify [KTA] of the occurrence of any event or condition, the responsibility or maintenance of which rests with the [KTA]." The district court did not address the importance of this provision in its ruling. Even assuming as true the district court's finding that the KTA was solely responsible for removing the snow and ice from the semi-truck parking lot at the Truck Stop, the Operators still owed a duty to notify the KTA of a potentially unsafe condition because of the lack of snow or ice removal in the semi-truck parking area. This constitutes an alternative basis for finding the existence of a duty that was not addressed by the court.

In conclusion, the district court erred by finding the Operators owed no duty of reasonable care to ensure the removal of snow or ice in the semi-truck parking area at the Truck Stop. The intent of the parties to the lease agreements is unclear due the ambiguity of the leases regarding Operators' snow and ice removal responsibilities at the Truck Stop. Given the expressed purpose of the lease agreements to maintain the Truck Stop to benefit the traveling public, whether the parties intended for Operators to remove snow and ice in the semi-truck parking area remains a disputed question of material fact that precludes summary judgment. For these reasons, we reverse the district court's decision to grant Operators' motions for summary judgment and remand for further proceedings.

*II. We reject Ritter's evidentiary objections.*

Next, Ritter asserts that the district court erred by relying on inadmissible and controverted evidence when considering whether to grant summary judgment. Ritter mainly objects to the copies of the lease agreements relied on by Heartland and Gas-Mart in their respective motions, asserting that discrepancies between copies of each lease agreement—particularly related to the Map—created a genuine factual dispute as to which versions were the originals.

Appellate review of the admission of evidence requires a multistep analysis. First, a court must determine whether the evidence is relevant. "Relevance has two components: materiality, which is reviewed de novo; and probativity, which is reviewed for abuse of discretion." *State v. Page*, 303 Kan. 548, 550-51, 363 P.3d 391 (2015). None of the parties appear to dispute the relevance of the evidence on which the Operators rely to support their motions for summary judgment.

But the erroneous admission of evidence is subject to harmless error review under K.S.A. 2019 Supp. 60-261. See *Water Dist. No. 1 of Johnson Co. v. Prairie Center Dev.*, 304 Kan. 603, 618, 375 P.3d 304 (2016). Even if we assume—without deciding—that the district court erred when it considered the copies of the leases, it did not affect Ritter's substantial rights. We agree that the record keeping on the part of the Operators and the KTA was very sloppy. But we also agree with the district court in the conclusion that even though there may have been multiple copies of the leases and Map floating around—some in color, some in black and white—the content that is material to this case was all the same. Even examining a black and white copy—which is all that is in the record on appeal—it is clear what area is highlighted. The language of the leases is the same; some had attachments, some did not. But for purposes of the Operators' summary judgment motions, Ritter could not show any genuine issue of material facts related to the copies. And given that we are reversing the district court's grant of summary judgment,

24

its consideration was harmless. In fact, reviewing the documents worked in Ritter's favor. The parties can reexamine issues of admissibility of the documents at trial.

Ritter also contends that Pettersen was not qualified to submit an affidavit in support of Heartland's motion for summary judgment and, likewise, that Pettersen was not a proper party to authenticate or testify about his understanding of any of the agreements referenced in support of Operators' motions. We find this argument to be unpersuasive. Although we do not condone Mr. Pettersen's actions here in substituting a color copy of the Map from another file in responding to discovery requests, we find nothing inappropriate about his affidavit. He attested he was the credit manager for the KTA and he was responsible for contract compliance; he was custodian of the leases and he was familiar with them. We agree with the district court that Pettersen had personal knowledge and was competent to testify on the matters stated in his affidavit in accordance with K.S.A. 2019 Supp. 60-256(e)(1).

*III. Ritter has standing to sue Gas-Mart for negligence.*

Finally, Gas-Mart contends that Ritter, as a nonparty to the lease, lacks standing to argue the ambiguity of the lease regarding who has the duty to remove snow and ice in the semi-truck parking area of the Truck Stop.

> "Standing is a question of whether the plaintiff has alleged such a personal stake in the outcome of a controversy as to warrant invocation of jurisdiction and to justify exercise of the court's remedial powers on his or her behalf. . . .The party must have personally suffered some injury and there must be a causal connection between the injury and the challenged conduct." *Moorhouse v. City of Wichita*, 259 Kan. 570, 574, 913 P.2d 172 (1996).

To support its claim, Gas-Mart cites one case, *Storts v. Hardee's Food Systems, Inc.*, 919 F. Supp. 1513 (D. Kan. 1996). Unfortunately for Gas-Mart, *Storts* does not

apply here. Storts was abducted from a Hardee's at a KTA Truck Stop. She claimed that her abduction and resulting injuries resulted from Hardee's negligence. When she was advised that her negligence claim was untimely, she abandoned it to pursue a timely breach of contract claim. She claimed she was a third-party intended beneficiary of the contract between KTA and Hardee's and sued to enforce the contract, even if she was not a party to it. The federal district court found that Storts was not a third-party beneficiary of the KTA and Hardee's contract so she could not pursue a breach of contract claim. 919 F. Supp. at 1513, 1519-20.

The inapplicability of *Storts* to Ritter's case is clear. Ritter is not making a breach of contract claim. He is not claiming he is an intended beneficiary of the contract. At most he is an incidental beneficiary of the contract, but he does not even make that claim. All *Storts* tells us is that Ritter lacks standing to sue to enforce the contract between Gas-Mart and KTA. But Ritter is not seeking to enforce the contract. He is not claiming that Gas-Mart breached the contract. Ritter is pursuing a negligence claim and arguing that Gas-Mart had a duty—based on the contract it has with KTA—to remove snow and ice from the area where Ritter fell.

We are unaware of any cases that prevent an examination of a contract and its meaning to establish negligence, and Gas-Mart cites none. So its claim fails. Ritter has standing to pursue his negligence claim.

Summary judgment orders reversed and case remanded for further proceedings.

26